IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION

RUDOLFO GARCIA,                )
                               )
               Plaintiff,      )
                               )
     v.                        )       No. 07 C 5828
                               )
CITY OF CHICAGO,               )
                               )
               Defendant.      )

                  MEMORANDUM OPINION AND ORDER

     Rudolfo Garcia ("Garcia") has sued the City of Chicago

(City") for the claimed infringement of Garcia's claimed service

mark rights in the name "Graffiti Blasters" for the removal of

graffiti from buildings and other sites in the Chicago area--an

activity that each of them had concededly pursued for many years

(Garcia since 1985, City since 1993) under the identical name.[1]

City has moved for summary judgment under Fed. R. Civ. P.

("Rule") 56 on laches grounds, and Garcia has now responded, so

that the motion is ripe for decision.[2]  For the reasons stated in

this memorandum opinion and order, City's motion is granted and

this action is dismissed with prejudice.

---

    [1] Garcia has concededly laid off all of his employees,
though he claims still to be operating his business (presumably
as a one-man show).  But he lays the blame for shrinkage of his
operations on the confusion and asserted usurpation of good will
stemming from City's use of "Graffiti Blasters."

    [2] Both sides have complied with this District Court's LR
56.1, adopted to facilitate the consideration and disposition of
Rule 56 motions.  Because as explained hereafter Garcia has
admitted most of City's LR 56.1(a)(3) statement of material facts
in his LR 56.1(b)(3) responses, this opinion will regularly refer
to those responses under the rubric "G. Resp. ¶--."

Here is City's opening gun, the first paragraph in its memorandum in support of its Rule 56 motion:

> There is an old maxim--oft quoted in laches cases--that "those who sleep on their rights, lose them." Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 820 (7th Cir. 1999). The plaintiff in this case, Rudolfo Garcia, did precisely that--he slept on his rights. He filed this case 14 years after he first became aware of the City's use of the GRAFFITI BLASTERS name, and 10 years after he sent a cease and desist letter to the City. Allowing Mr. Garcia to enforce his trademark rights against the City now, 14 years after the City expanded its program and invested millions of dollars into the program, would unfairly prejudice the City. This is laches as a matter of law.

Although Garcia's responsive memorandum begins "Plaintiff Rudolfo Garcia ('Garcia') has not slept on his trademark rights," that assertion is directly refuted by Garcia's own presentation. Indeed, but for the caption "Plaintiff Rudolfo Garcia's Brief in Response to Defendant's Motion for Summary Judgment," the reader could well view Garcia's account of events as a submission on behalf of City rather than himself.

If there were any doubt on that score, it would be dispelled in principal part by reading attached pages 3-6 of Garcia's Brief, and what Garcia leaves out in that respect is fleshed out by Garcia's admissions in his LR 56.1 response that he took four years (from 1993 to 1997) after learning about City's use of the mark, during which time City had cleaned more than 200,000 buildings and had given extraordinarily widespread currency to its own use of the Graffiti Blasters name, before he even complained about it. Then, even more remarkably, Garcia let his

2

objection to City's use lie fallow for <u>10</u> years after his then lawyer had written City on June 12, 1997 (G. Resp. ¶41):

> As a result of this continued infringement of his rights, Mr. Garcia feels he has been left with no alternative other than proceeding with litigation against the City of Chicago, unless some offer of settlement is made within 30 days of the date of this letter.

That demand was met with City's August 7, 1997 response (G. Resp. ¶42) stating that Garcia's "claim of service mark infringement is meritless" and that Garcia did not have protectible rights in Graffiti Blasters, yet Garcia didn't drop the other shoe until he brought this action on October 15, 2007.

Meanwhile City's activities, and its expenditures in building good will <u>for itself</u> in the Graffiti Blasters name, have been staggering. As the attached pages show, Garcia's response has admitted everything at G. Resp. ¶¶6-31.[3]

Although it may be regrettable that Garcia was unsuccessful in the many attempts that he has described to get legal representation during the hiatus of a full decade, he cannot seek to place that at City's doorstep. So far as City was concerned, it had received a shot across its bow in 1997--one that it promptly challenged--followed by 10 years of silence. Garcia's

---

[3] Garcia's disclaimer, even while expressing agreement, that some of those statements (all supported by the record) are non-material reflects his and his lawyer's opinion, but that self-characterization does not make the disclaimer accurate. And in a few places where Garcia does not agree to City's statements on the premise that the assertions represent its opinion (G. Resp. ¶¶ 24, 29 and 31), those few disclaimers by Garcia do not create any genuine issue of material fact.

delay between his acquiring knowledge of City's usage in 1993 until he filed suit in 2007 is almost five times the three year statute of limitations that is drawn by analogy from the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a(e)). And in terms of laches, Garcia's 10-year silence between the 1997 exchange of communications and his commencement of suit in 2007, coupled with City's enormous activities and expenditures in the interim, provide a poster child for a laches defense.

It is scarcely necessary to cite authority for that immutable proposition, but City has drawn attention to the teaching in such cases as <u>Chattanoga Mfg., Inc. v. Nike, Inc.</u>, 301 F.3d 789, 792-95 (7th Cir. 2002)(also involving a 14-year delay), <u>Hot Wax, Inc. v. Turtle Wax, Inc.</u>, 191 F.3d 813 (7th Cir. 1999) and <u>Wis. Cheese Group, Inc. v. V&V Supremo Foods, Inc.</u>, 537 F.Supp.2d 994, 1001-05 (W.D. Wis. 2008)(involving still another 14-year delay). Just as in those cases, City has undisputedly established every element of a laches defense.

Accordingly there is no genuine issue of material fact, and City is entitled to a judgment as a matter of law pursuant to Rule 56. This action is dismissed with prejudice.

                                            */s/ Milton I. Shadur*
                                            Milton I. Shadur
                                            Senior United States District Judge

Date: February 2, 2009

~~defendant's infringement, (2) the plaintiff inexcusably delayed in taking action against~~ the defendant, and (3) the defendant would be prejudiced by allowing the plaintiff to assert its rights now. *See Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792-93 (7th Cir. 2002). Furthermore, the district court retains "considerable discretion in determining whether to apply the doctrine of laches to claims pending before it." *Hot Wax*, 191 F.3d at 819.

Under laches, a presumption of undue delay is raised if the plaintiff files suit after the statute of limitations has lapsed. *See Chattanoga*, 301 F.3d 793. However, the Lanham Act has no statute of limitations; therefore, one is borrowed from an analogous state statute. *Id.* The borrowed statute of limitations serves only as a basis for the presumption. *Id.* Garcia agrees with the City's assertion that under Illinois law, the relevant statute is the Illinois Consumer Fraud and Deceptive Practices Act and that it ~~carries a three year statute of limitations.~~

### i. GARCIA HAD KNOWLEDGE IN 1993

Garcia first received knowledge of the City's infringement in 1993. The City's program was brought to his attention when he received a complaint from a homeowner. A house had been damaged when graffiti was removed from it. However, Garcia had not done any work on that specific house. The homeowner had phoned Garcia because the truck used by those who did the work had "GRAFFITI BLASTERS" written on the side. This confusion was Garcia's introduction to the City's program.

Garcia admits that he is filing this case after the prescribed statute of limitations, and thus faces a presumption of undue delay. However, examinations of the remaining elements of laches clearly indicate that delay was justified.

### ii. GARCIA HAS NOT UNREASONABLY DELAYED HIS SUIT

Garcia has consistently attempted to pursue this action against the City. Since 1993, Garcia has pursued his claim through various means. However, Garcia has been frustrated throughout due to the fact that the confusion stemming from the City's infringement essentially eliminated any income from his business.

Garcia's first attempt to enforce his rights was to speak to local officials. He brought the infringement to the attention of his local alderman. However, this was eventually fruitless and nothing was done regarding the infringement. (Material Facts ¶ 54.)

In 1997, Garcia engaged Dvorak & Orum of Chicago to write a cease and desist letter to the city. The city responded in August of 1997, denying that there was any cause of action that could be brought against it. The letter was signed by Peter Donoghue, Assistant Corporation Counsel. Garcia and Dvorak & Orum discussed pursuing the litigation at this time. However, the Dvorak & Orum firm was unwilling to pursue the matter on a contingency basis. Garcia did not have the financial means to pay the retainer required. (Material Facts ¶ 55.) For that reason, Garcia had to look for different attorneys to represent him. Sadly, his inability to meet the financial requirements of such litigation continued to deny him access to the courts.

In the years that followed, Garcia met with numerous attorneys in regards to his legal issue. In late 1998, Garcia talked to various Chicagoland attorneys including: Edward Barron (passed on the case because he does traffic law), former Alderman Juan Soliz (referred Garcia to another attorney), Joseph Moreno (not interested), John DeLeon (passed on case because he does criminal law, referred to another attorney), Rosenfield,

Garcia's Brief
4

Kaplan, & Halperin (took a desposit, but did no work on the case), and Edward Vrydolyak (advised Garcia to seek federal help). (Material Facts ¶ 56.)

In 1999, Garcia continued to seek legal help, expanding his search to out of state lawyers. Throughout the year, he spoke to: Christopher Hall & Associates (Chicago, June '99, does not do contingency work), Tara Williams and James Fallin (Durham, NC, June '99, only does patent law), Robert Kemp (Chicago, February '99, no contingency work), John Mortimer (Chicago, demanded too large of a retainer), Baker & Rannell, P.A. (New Jersey, July '99, out of region and no contingency cases), Maurice Finnegan, P.A. (Chicago, September '99, not interested and no contingency work), and Thomas Vega (Chicago, November '99, no contingency work). Garcia also spoke to Lauren Hammond of the Senate Rules Committee in May of '99 who directed him to attorneys. (Material Facts ¶ 57.)

Garcia continued his search for representation in 2000. That year, he spoke with Robert Plotkin and Associates (Burlington MA, February '00, no contingency), Barney, Owens, Laughlin (Barrington, IL, April '00, could not come to terms), William Oberhardt (Chicago, October '00, no contingency), Neal, Gerber & Eisenberg (Chicago, August '00, no contingency), Stadheim and Grear (Chicago, July '00, conflict of interest), Cummins & Associates (Chicago, July '00, no contingency), Hanafan and Hanafan (Chicago, May '00, only deals with arbitration matters), and Ungaretti and Harris (Chicago, December '00, does health care law). (Material Facts ¶ 58.)

In 2001, Garcia unsuccessfully spoke to Winston and Strawn (Chicago, February '01, conflict), Gartenberg, Gelf and Wasson (Los Angeles, April '01, no contingency), Krongold Law Firm (Irvine CA, April '01, no contingency), Gregory Richardson

(Riverside CA, April '01, will not work in Chicago), Water Batt (Beverly Hills CA, April '01, does entertainment law, not trademark litigation), Clemens & Spencer (San Antonio, July '01, practices insurance law, will not come to Chicago, no contingency), Haynes and Boone (San Antonio, July '01, not interested), Stump Farramond (San Antonio, July '01, corporate law, only works in Texas), Wood and Lampkin (Cincinnati, August '01, no contingency and only works in Ohio), Blank Rome (Cincinnati, August '01, no contingency), and Beem Patent Law Firm (Chicago, November '01, patent work only). (Material Fact ¶ 59.)

In 2002, Garcia continued his search by speaking to Sylvesters and Williams (Chicago, November '02, no contingency), McKenna, McGovern and Burkhart (Chicago, April '02, conflict of interest), Dressler Peters (Chicago, June '02, no contingency), and Francissen Law (Chicago, August '02, couldn't agree on terms). (Material Fact ¶ 60.)

Garcia took other actions to attempt to find legal help. For example, while in Washington, D.C. he attempted to file a complaint with the United States Patent and Trademark Office. He also spoke to the F.B.I. (Material Facts ¶ 61.) While an attorney may know what routes are the quickest to the courtroom, the simple fact is that Garcia did not. Therefore, unfortunately, he wasted valuable time in his efforts.

Throughout the years, Garcia has attempted to find anyone to help him with his cause of action against the City. However, he could not find a lawyer or law firm that was in position to accept the case on economic terms that agreed with the economic realities faced by Garcia. While Garcia does not fault any of the above listed attorneys for refusing to take a contingency case against a large defendant such as the City, Garcia cannot be said to have "slept on his rights".

Response: Agree.

4. The City is an Illinois Municipal Corporation with offices in Chicago, Illinois. (Ex. 1, Dkt. No. 1, Complaint ¶ 2.)

Response: Agree.

C. Jurisdiction and Venue

5. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338. This Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367, 1338(b). Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391. (Ex. 1, Dkt. No. 1, Complaint ¶ 3, 4.)

Response: Agree.

D. The City's GRAFFITI BLASTER Program

6. In 1993, the City launched the GRAFFITI BLASTERS program to tackle the endemic problem of graffiti in the City of Chicago. (Ex. 2, Dec. 18, 2008 Sclafani Decl. ¶3; Ex. 2, Selafani Decl., Ex. C, CH000001.)

Response: Plaintiff asserts that this in non-material fact, but will Agree.

7. The City's GRAFFITI BLASTERS program offers free graffiti removal services to private property owners. (Ex. 2, Sclafani Decl. ¶ 3; Ex. 2, Sclafani Decl., Ex. B, CH016438.)

Response: Agree.

8. With its GRAFFITI BLASTERS program the City became the first major municipality in the United States to assume the financial responsibility for removing

Garcia Response

graffiti from private property. (Ex. 2, Sclafani Decl. ¶ 3; Ex. 2, Sclafani Decl., Ex. C, CH00001.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

9. The GRAFFITI BLASTERS program uses a mixture of baking soda and a high pressure stream of water to remove graffiti from various surfaces. (Ex. 2, Sclafani Decl. ¶ 4; Ex. 2, Sclafani Decl, Ex. D, CH016424.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

10. Prior to the launch of the GRAFFITI BLASTERS program, the City required private property owners to remove graffiti or be ticketed. (Ex. 2, Sclafani Decl. ¶ 5.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

11. Under the GRAFFITI BLASTERS program, either the property owners or other members of the public can request the City to remove graffiti front private property at no charge. (Ex. 2, Sciafani Dec. ¶ 5.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

12. The City does not derive any revenue from the GRAFFITI BLASTERS program. (Ex. 2, Sclafani Decl. ¶ 5.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

13. The annual budget for the GRAFFIT BLASTERS program is approximately $4,000,000 to $6,500,000. (Ex. 2, Sclafani Dec. ¶ 6.)

**Response:** Agree.

14. The total expenditures for the GRAFFITI BLASTERS program since its inception fourteen years ago is over $60,000,000. (Ex. 2, Sclafani Dec. ¶ 6.)

**Response:** Agree.

Garcia Response

15. The City currently has 27 blaster crews and 14 painter crews working full time in the GRAFFITI BLASTERS program and each crew includes two workers, and a truck or van that bears the wording GRAFFITI BLASTERS, STREETS AND SANITATION. The blaster trucks have a blue color scheme that consistently appears on Streets and Sanitation vehicles. (Ex. 2, Sciafani Decl. ¶ 7; Ex. 2, Sclafani Decl., Ex. A, CH001041, CR001045, CH001048; Ex. 2, Sclafani Decl., Ex. B, CH001746, CH001753-54, CH016358.)

**Response:** Agree

16. For the past ten years, the GRAFFITI BLASTERS program has employed approximately 27 blaster crews and 10 painter crews. (Ex. 2, Sclafani Decl. ¶ 7.)

**Response:** Agree.

17. The City has engaged in various forms of promotion of its graffiti removal service since its inception, consistently using the GRAFFITI BLASTERS name. (Ex. 2, Sciafani Decl. ¶ 8; Ex. 2, Sclafani Decl., Ex. A.)

**Response:** Agree.

18. . The City's promotional materials appear in English, as well as in Spanish. (Ex. 2, Sclafani Decl. ¶8; Ex. 2, Sclafani Decl., Ex. A, CH000212-17, CH0000627-34, CH000839-44, CHOOIO41-48, CH001755-56, CH001772-73, CH001802-03, CH001848-49, C11012957-58, CH014238-39, CH015324-25, CH016426, CR016440.)

**Response:** Agree.

19. The City has enlisted celebrities to help promote the GRAFFITI BLASTERS program, including Arnold Schwarzenegger, Jim Belushi, Harrison Ford, George Clooney, Roger Ebert, Scottie Pippen of the Chicago Bulls, Chris Zorich of the Chicago

Garcia's Response

Bears, Donnie Osmond and Carlos Ponce. (Ex. 2, Sclafani Decl. ¶ 9; Ex. 2, Sclafani Decl., Ex. A, CR000213, CR000216, CH000628, CR000629, CR000631, CR000633, CR000839, CR000841, CR000843, CR001043, CR001046, R001755, CR001772, CR001848, CR014238-39, CR015325.)

**Response:** Agree.

20. English and Spanish language newspapers have also run articles and photographs of celebrities promoting the GRAFFITI BLASTERS program. For example, the *Chicago Defender*, the *Near North News, The Back of the Yards Journal,* and *The Chicago Crusader* published a photograph of Chicago Bulls Star Scottie Pippen promoting the GRAFFITI BLASTERS program in 1996, the *Chicago Sun-Times* and the *Chicago Defender* both published a photograph of gospel singer Melba Moore promoting the GRAFFITI BLASTERS program in 1999, and *El Norte* published a photograph of Brenda Star promoting the GRAFFITI BLASTERS program in 2000. (Ex. 2, Sclafani Decl., ¶ 9; Ex. 2, Sclafani Decl., Ex. B, CH000057, CH000058, CR000065, CR000081, CR000397, CH000414-17, CR000695-99, CR014051, CR014790, CH015845.)

**Response:** Agree

21. Many newspapers, including the *Chicago Tribune, Chicago Sun-Times, Back of the Yards Journal, Mount Greenwood Express, LaRaza, Chicago Defender, The Beverly Review* and *Near North News,* as well as national media outlets, *The Wall Street Journal* and *Reuters News* Service, have run ads and/or articles concerning the City's GRAFFITI BLASTERS program. (Ex. 2, Sclafani Decl. 18; Ex. 2, Sclafani Decl., Ex. B, CR000442, CH000460, CR000478, CH000711-12, CH000862, CH001746, CH001753, CH001788,

Garcia Response

CH001796-1801, CH001841, CH014805-6, CH014808, CH014810, CH015842; Ex. 3, December 23, 2008 Jackson Decl. ¶ 3, Ex. A, CH000020-26, CH000029-31.)

**Response:** Agree.

22. Many internet [*sic*] media outlets have run articles concerning the City's GRAFFITI BLASTERS program. (Ex. 4, December 23, 2008 Giertz Decl. ¶ 3, Ex. A, CH000013-19.)

**Response:** Agree.

23. The City also promotes its GRAFFITI BLASTERS program on its website, which lays out the particulars of the GRAFFITI BLASTERS program, and with press releases. (Ex. 2, Sclafani Decl. ¶ 11; Ex. 2, Sclafani Decl., Ex. C, CH000001-4, CH016442- 43.)

**Response:** Agree.

24. The GRAFFITI BLASTERS program has been a great success for the City. (Ex. 2, Sclafni Decl. ¶ 12.)

**Response:** Plaintiff disagrees, as this is an opinion and not a fact.

25. By the summer of 1995, the City's GRAFFITI BLASTERS program had cleaned graffiti from 100,000 sites; 5,585 sites in May 1995 alone. (Ex. 2, Sclafani Decl. ¶ 12; Ex. 2, Sclafani Decl., Ex. A, CH001802.)

**Response:** Agree.

26. By winter 1997, the City's GRAFFITI BLASTERS program had cleaned more than 200,000 buildings in the City. (Ex. 2, Sclafani Decl. ¶ 12; Ex. 2, Sclafani Decl., Ex. A, CH000839.)

**Response:** Agree.

Garcia Response

27. The City's GRAFFITI BLASTERS program has now cleaned graffiti from over 1,000,000 sites in the City along with thousands of light poles, traffic signs, mailboxes and other infrastructure. (Ex. 2, Sclafani Decl. ¶ 12; Ex. 2, Sclafani Decl., Ex. C, CH016442.)

**Response:** Agree.

28. The City's program has been copied by other cities around the world. Representatives from cities in the U.S. and outside the U.S., such as New York; Milan, Italy; Rome Italy; Prague, Czech Republic; and Warsaw, Poland have come to Chicago to study its GRAFFITI BLASTERS program. (Ex. 2, Sclafani Decl. ¶ 13; Ex. 2, Sclafani Decl, Ex. A, CR014239; Ex. 3, Jackson Decl., Ex. A, CR000029.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

29. The City has learned that the removal of graffiti is beneficial to a neighborhood, in that removing graffiti generates pride in the neighborhood, has a positive impact on economic development, and makes the City a nicer and more attractive place to live and work. (Ex. 2, Sclafani Deal. ¶ 15; Ex. 2, Sclafani Decl., Ex. A, CR000841; Ex. 2, Sciafani Deal., Ex. B, CR000862.)

**Response:** Plaintiff asserts that, based on the record, this is merely opinion.

30. Many small business owners have contacted the City with words of appreciation for the GRAFFITI BLASTERS program, and have indicated that this program has contributed to some of their decisions to keep their businesses within the City limits. (Ex. 2, Sclafani Decl. ¶ 15, Ex. 2, Sclafani Decl., Ex. C, CH000001.)

**Response:** Plaintiff asserts that this in non-material fact, but will Agree.

*Garcia's Response*

31. There is far less graffiti evident within the City today than there was in 1994. (Sclafani Decl. ¶ 15.)

**Response:** Plaintiff asserts that, based on the record, this is merely opinion.

B. [sic] Mr. Garcia and His Business

32. Mr. Garcia asserts that he has used the name GRAFFITI BLASTERS in the Chicagoland area since 1985 in connection with his private graffiti removal business. (Ex.1, Dkt. No. 1, Complaint ¶ 5; Ex. 5, Pl.'s Resp. to Def.'s First Set of Interrog. No. 8.)

**Response:** Agree.

33. Mr. Garcia's current employees have been laid off. (Ex. 5, Pl.'s Resp. to Def.'s First Set of Interrog. No. 5.)

**Response:** Agree.

C. [sic] **Mr. Garcia's Knowledge of the City's Use of GRAFFITI BLASTERS**

34. Mr. Garcia has known about the City's use of GRAFFITI BLASTERS in connection with its graffiti removal program since 1993. (Ex. 5, Pl.'s Resp. to Def.'s First Set of Interrog. No. 1.)

**Response:** Agree.

D. [sic] **Mr. Garcia's Prior Contacts With the City**

35. Mr. Garcia waited until 1997 to first contact the City and assert his alleged trademark rights in GRAFFITI BLASTERS. (Ex. 2, Sclafani Decl. ¶ 6.)

**Response:** Plaintiff denies, see ¶ 54.

36. On March 27, 1997, Mr. Garcia's counsel sent a letter to the City asserting rights in the GRAFFITI BLASTERS name, which stated: "The City's use of the identical mark for the same services offered by Mr. Garcia has created confusion in the purchasing

Garcia Response